UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| | : | |
| HELEN THOMPSON, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | CASE NUMBER:  8:06-cv-01201-EAK-TBM |
| | : | |
| LIFE INSURANCE COMPANY | : | |
| OF NORTH AMERICA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## ( DISPOSITIVE MOTION)

Plaintiff, Helen Thompson, pursuant to Rule 56, Fed.R.Civ.P., hereby moves for the entry of a summary judgment in her favor against Defendant, Life Insurance Company of North America ("LINA").  Plaintiff is claiming entitlement to accidental death benefits for her husband Gerald Thompson's death that were denied by LINA on the basis of an exclusion for death resulting from "intoxication as determined according to the laws of the jurisdiction in which the Covered Accident occurred," and also on the ground that Gerald Thompson's accidental death was contributed to by one of the effects of normal aging, specifically the increased susceptibility of the elderly to subdural hematomas.  The grounds for this motion are set forth in the accompanying memorandum of law.

## MEMORANDUM OF LAW

### I.    FACTUAL SUMMARY

Gerald Thompson died from "complications of blunt head trauma" suffered in an accidental fall in a parking lot on August 24, 2004 (AR0086-87).[1]   An instructor in a packaging business, he had stayed behind when his trainees went out to dinner after a training meeting.  When they returned about two hours later, Gerald Thompson was lying in the parking lot, poorly responsive and disoriented.  (AR0087-88).  He was transported to a hospital where a blood test indicated a serum alcohol level at that time of 0.205%.  A few hours later, Gerald Thompson's neurological status markedly deteriorated; a CT scan showed significant enlargement of a subdural hematoma he had suffered from the fall.  *(Id.)*  Gerald Thompson died from his injuries approximately one month later.  (AR0086).

### II.   STANDARD OF REVIEW

This Court's review of LINA's denial of benefits to Plaintiff is *de novo*, with no deference accorded to the plan administrator's decision.  This is the default standard of review that applies unless the plan documents grant the administrator discretionary authority.  *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In discovery, Plaintiffs requested LINA to produce all documents they contended comprised the employee welfare plan at issue.  (Schropp Affidavit, Ex. 2).  LINA responded that it would produce all

---

[1]      References to the Administrative Record (Exhibit 1 to the Schropp Affidavit) will be designated as "AR," followed by the Bates number of the page(s) referenced.

responsive documents in its possession.   After repeated requests for these documents, LINA's counsel has confirmed that the only plan document in LINA's possession was the policy itself.  (Schropp Affidavit, Ex. 3).

The LINA policy contains nothing that would alter the *de novo* standard of review. This is confirmed by *Dixon v. Life Ins. Co. of North America*, 389 F.3d 1179 (11th Cir. 2004) ("*Dixon*") in which the Eleventh Circuit held that the LINA "OK" policy form that is at issue in this case does not give the administrator discretionary authority to determine eligibility for benefits, stating:

> Because the LINA policy does not give the plan administrator discretionary authority to determine eligibility for benefits, this court, like the district court, construes the policy de novo, making an independent determination of the issues and not giving any weight to a prior determination by the plan administrator.

389 F.3d at 1182 (internal citations omitted).

While *de novo* review is mandated, Plaintiff does not believe this case turns on the standard of review.   Plaintiff's motion is based on LINA's failure to follow the clear language of its own policy, and its attempt to disclaim a risk that the courts have held for over 75 years that an accidental death insurer assumes.   No standard of review authorizes an administrator to ignore the unambiguous terms of its own policy, particularly where, as here, the Defendant is operating under a strong conflict of interest in its dual capacity as claims administrator and as insurer of the risk.   *HCA Health Services of Ga. v. Employers Health Ins. Co.*, 240 F.3d 982, 1001 (11th Cir. 2001).

III.   **THE LINA POLICY EXCLUSION FOR LEGALLY DETERMINED INTOXICATION CANNOT BE A BASIS FOR DENYING ACCIDENTAL DEATH BENEFITS TO PLAINTIFF.**

As its first basis for denying accidental death benefits to Plaintiff for the death of her husband, Gerald Thompson, LINA relied on a policy exclusion providing that accidental death benefits will not be paid for a death that wholly or partially is caused by or results from:

> 7.     The Covered Person's intoxication as determined according to the laws of the jurisdiction in which the Covered Accident occurred."
> (AR 0098)

After quoting this exclusion, in its May 19, 2005 denial of benefits letter, LINA stated its position on the exclusion's applicability as follows:

> The evidence on file supports that at the time of his fall/collapse that Gerald Thompson was legally intoxicated and that this intoxication would have contributed at least *in part* to the claimed accidental injury.  For this reason, no Group Term Accidental Death Benefits are payable under Policy OK 960038.  (AR 0092)

LINA's "legal intoxication" exclusion is tied directly to substantive state law and requires that, in order for the exclusion to apply, Gerald Thompson must have been considered legally intoxicated at the time of his accident under the laws of the jurisdiction in which the accident occurred.  The LINA policy thus explicitly contemplates that the applicability and effect of this exclusion will vary based on how the question of legal intoxication is treated in the jurisdiction in which a particular accident occurred.

In this case, the accident occurred in Lakeland, Polk County, Florida.  Plaintiff served interrogatories requesting LINA to identify the law or laws that it relied on for its conclusion

4

that Gerald Thompson was "legally intoxicated" at the time of his accidental fall (Docket No. 20).  LINA responded by objecting on the ground that these interrogatories called for a legal conclusion.  *Id.*  This Court granted Plaintiff's motion to compel, ordering LINA to state with particularity the law or laws upon which it was relying (Docket No. 21).  LINA then served a supplementary answer stating that it had utilized the blood alcohol level set out in Florida Statute §316.193 ("§316.193") in applying the exclusion.  See Schropp Affidavit, Ex. 2.

LINA's reluctance to identify the law upon which it was purporting to rely becomes very understandable when this statute is reviewed.  Section 316.193 defines the offense of "driving under the influence;" by its express terms, this statute applies only to a person who "is driving or in actual physical control of a vehicle."  It is undisputed that Mr. Thompson was on foot at the time of his accident.

Applying a statute that establishes a blood alcohol level limit for a specific activity to facts that are totally outside of the scope of the statute is plainly erroneous (and also, by definition, arbitrary and capricious).  This is even more so when the exclusion expressly provides that the fact of intoxication must be determined according to state law.  No Florida court would determine that Gerald Thompson was legally intoxicated while walking outside his condominium because his blood alcohol level exceeded what would have been the applicable limit if he had instead been driving a car.

Section 316.193 is only one of several Florida statutes that prohibit specific activities by a person under the influence of alcohol.  For example, §860.13, Fla. Stat. (2004), makes it unlawful for a person to operate an aircraft while under the influence of alcoholic

beverages.  Federal regulations provide that anyone who has consumed alcohol within the past eight hours, or has a blood alcohol level of .04 percent or higher, may not serve as a crew member on an aircraft.  14 C.F.R. §91.17(a) (2004).  Similarly, §790.157(1), Fla. Stat. (2004), makes it unlawful for a person who is under the influence of alcoholic beverages to use a firearm; for purposes of this statute, a level of 0.10 by weight of alcohol in the person's blood is *prima facie* evidence that the person is under the influence of alcohol. §790.157(2)(c), Fla. Stat. (2004).  It would have been no less arbitrary for LINA to have relied on one of these statutes as its basis for denying benefits to Plaintiff, since not only was Gerald Thompson *not* driving a car when he fell, he was also *not* piloting an aircraft and *not* using a firearm.

Florida has chosen to define a permissible level of blood alcohol only for certain specific types of conduct.  The selection of those activities for which a maximum permissible limit is to be established, and the blood alcohol level used to determine whether a person is considered under the influence of alcohol for the purposes of a particular statute, appear to be based on the hazardness of the conduct, with emphasis on risk that the conduct poses to third parties.  Consumption of alcoholic beverages by an adult is a legal activity; walking, even while inebriated, is not a hazardous activity in the sense of driving, flying or shooting a gun, and poses no risk to third parties.

Florida law not only fails to establish a blood alcohol level that constitutes public impairment, but also includes a statute that expressly prohibits such a classification.  Section 397.701, Fla. Stat. (2004) ("§397.701"), provides as follows:

6

A county, municipality, or other political subdivision of the state may not, except pursuant to the provisions of s. 397.702, adopt a local law, ordinance, resolution, or regulation having the force of law which provides that impairment in public in and of itself, or being found in enumerated places in an impaired condition, is an offense, a violation, or the subject of civil or criminal sanctions or penalties of any kind.  This section does not affect offenses involving the operation of motor vehicles, machinery, or other hazardous equipment.[2]

Thus, Florida has determined as a matter of public policy that merely consuming alcohol may not be "the subject of civil or criminal sanctions or penalties of any kind."  *Id.* The effect on LINA's "legal intoxication" exclusion is that, in Florida, the exclusion applies only to an insured who is engaged in an activity, such as driving an automobile, piloting a plane or using a gun, for which a blood alcohol level constituting legal intoxication has been established.  It does not apply to someone who has merely consumed alcoholic beverages.[3] Florida law has established no threshold for legal intoxication that would apply to the facts of this case.

The administrative record reflects that LINA was cognizant of the serious question whether its exclusion was applicable to Gerald Thompson's accident under Florida law.  The

---

[2]      Section 397.702 authorizes the detention at a licensed treatment center of a narrowly-defined class of "habitual abusers."

[3]      Plaintiff believes this is the only permissible reading of LINA's exclusion, but it is without question a reasonable interpretation of this exclusion.  Thus, even if LINA were to somehow persuade the Court that the exclusion can also be read to permit applying a DUI statute to a person who is on foot, the result still would be the same.  The rule of *contra proferentum* would apply, and the ambiguity in the exclusion would be construed against its drafter, LINA.  *Billings v. UNUM Life Ins. Co. of America*, 459 F.3d 1088, 1095 (11th Cir. 2006); *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1551 (11th Cir. 1994).

record includes a "CFS Claim Referral Form" which referred Plaintiff's claim to an unidentified person for the purpose of answering the following question:

> Question:   Assuming that the facts of the case support a causal connection between intoxication and the insured's fall, in this jurisdiction, would the above noted policy exclusion be applicable?  (AR 0024-25.)

However, there is no indication this question was ever answered.  In other words, the administrative record offers no legal support for LINA's position that its "legal intoxication" exclusion applied to this accident notwithstanding the fact there is no Florida statute defining a level of legal intoxication that would apply to the undisputed facts of the case, and further that a Florida statute specifically provides that public impairment may not be the subject of civil sanctions or penalties.[4]  It appears that LINA just decided to baldly declare that Gerald Thompson was "legally intoxicated" at the time of his accident and, then refuse to explain the basis for its position on the ground that this represented a "legal conclusion."  This represents the soul of erroneous, arbitrary and capricious claim determination.

LINA's primary error was in applying the exclusion when there was no basis under applicable law for the required threshold finding that Gerald Thompson had been "legally intoxicated" at the time of his accident.  However, LINA's treatment of the facts relating to Gerald Thompson's alcohol consumption was also result-oriented in the extreme.  The initial conclusion that Gerald Thompson was legally intoxicated, and that this condition contributed to his death, appears to have been made by LINA's adjuster.  When Plaintiff appealed, LINA

---

[4]      LINA was aware of the existence of §397.701, since Plaintiff's counsel sent LINA a letter enclosing a copy of this statute (AR 0054-55).

retained Dr. Thomas C. Bruff, a self-styled "independent medical review specialist" from California, to render an opinion only on whether Gerald Thompson's alcohol consumption had contributed to his death (AR 0061-62).

Not surprisingly, Dr. Bruff seconded the adjuster's conclusion on this issue. However, Dr. Bruff's report is principally noteworthy in that it is riddled with factual error. First, Dr. Bruff misread Gerald Thompson's hospital records and incorrectly transcribed his alcohol level as .25, rather than as .205, an overstatement of approximately 25% (*compare* AR 0061 *with* AR 0070).  Dr. Bruff then referred to the test as a blood alcohol test, although it was a serum alcohol test that produces readings about 20% higher than the corresponding blood alcohol level (AR 0043).  These errors resulted in Dr. Bruff's assuming Gerald Thompson had a tested blood alcohol level almost 50% higher than the actual test results.

Without being aware that LINA had consulted Dr. Bruff, Plaintiff retained a toxicology expert, Ronald R. Bell, in connection with Plaintiff's administrative appeal.  Mr. Bell's qualifications included twenty-five years as the chief toxicologist for the District Six Medical Examiner in Pinellas County, Florida; Mr. Bell had also testified as an expert witness in court proceedings on approximately seven hundred occasions (AR 0045-46).

Initially, Mr. Bell opined that the blood alcohol test result LINA had relied on was unreliable in that it had not been obtained or tested using acceptable forensic standards.  He noted that only one test had been performed with unknown quality control, although at a minimum two tests on a given sample are necessary.  Mr. Bell pointed out that, without a

second test, there is no way to determine if the first test was a statistical outlier, *i.e.*, a result not representative of the subject's actual blood alcohol level (AR 0043-44).

Mr. Bell also observed that, because the test was on a serum sample, the reading would be approximately 20% higher than the corresponding blood alcohol concentration, meaning that, according to the test result, Gerald Thompson's blood alcohol level would have been approximately 0.169 (AR 0044). Mr. Bell then opined that Gerald Thompson's blood alcohol concentration would have been much lower at the time of his accident than at the time of his blood test because much of the alcohol he had consumed would not yet have been absorbed. It normally requires about sixty to ninety minutes for a person to reach peak or maximum blood alcohol concentration after he or she stops drinking; since Gerald Thompson's alcohol consumption occurred during the approximately one hour and forty-five minutes before he was found, Mr. Bell calculated that Mr. Thompson's actual blood alcohol level at the time of his accident was between .057 and .119. *Id.* The lower limit of this range is well under the permissible limit for the driving under the influence statute on which LINA relied, and even the upper limit is less than half the blood alcohol level assumed by Dr. Bruff.

LINA furnished Mr. Bell's report to Dr. Bruff to see if it changed his opinion. Unsurprisingly, it did not. Dr. Bruff's main response was to attack Mr. Bell's credentials, asserting that "Mr. Bell does not have experience dealing with human beings and intoxication" (AR 0035). This was an astonishing claim given Mr. Bell's twenty-five years of service as the chief toxicologist for the District Six Medical Examiner in Pinellas County, and his more than seven hundred court appearances as an expert on intoxication in human

10

beings.  Dr. Bruff also criticized the fact that Mr. Bell had been hired by the Plaintiff to make

assumptions to minimize the alcohol intoxication of Gerald Thompson, effectively ignoring

the circumstances of his own retention.  Significantly, however, Dr. Bruff did not attempt to

refute Mr. Bell's specific findings (AR 0034-36).

  The rest of Dr. Bruff's response is a muddle of inconsistencies.  While he accuses Mr.

Bell of relying on speculation, he also states that "there is no reasonable or factual basis to

determine when or how much Mr. Thompson consumed," thus admitting that his own

conclusions had to be at least equally speculative.  *Id.*  Dr. Bruff's only "analysis" of Mr.

Bell's calculations was to take the maximum blood alcohol level Mr. Bell calculated Gerald

Thompson could have had at the time of his accident, round it upwards, and opine that at this

blood alcohol level there is still considerable lack of coordination predisposing one to trip

and fall.  Dr. Bruff also asserted that Gerald Thompson's slurring of words, poor responses

and odor of alcohol on him at the time was "clear evidence of intoxication at the time of his

accident," ignoring the fact that Gerald Thompson had just sustained a traumatic head injury

severe enough to ultimately cause his death, and admittedly had consumed some alcohol,

which would account for the odor of alcohol on his person.  *Id.*

  Dr. Bruff also had no problem performing double duty as a lawyer.  Declaring that "I

am familiar with the medical and legal issues in this case," he opined that the lack of a

forensically-obtained sample was not relevant because "[t]he only reason for chain of

custody and a forensically controlled testing is when arrest and possible conviction for

violation of vehicle code or civil statutes is appropriate.  When there is no arrest or violation of such standards, there is no need for a forensically obtained specimen" (AR 0035).

Dr. Bruff's "legal opinion" was incorporated into LINA's letter denying Plaintiff's appeal (AR 0029).  This is significant in at least two respects.  First, Mr. Bell's actual conclusion was that the absence of appropriate procedures for collecting and testing the blood sample rendered the test results not only forensically unsound but also unreliable. Thus, LINA effectively took the position that reliability and accuracy were not necessary to its benefit determination.  Second, LINA inconsistently claims that Plaintiff may be denied accidental death benefits because Gerald Thompson's blood alcohol level exceeded what would have been the permissible legal limit if he had been driving a car, while at the same time asserting that, because Gerald Thompson was not driving a car when his accident occurred and therefore would not be subject to drunk driving penalties, LINA could predicate its denial on evidence that would admittedly have been incompetent to prove that Gerald Thompson was driving under the influence of alcohol if he had been behind the wheel.  Such Alice in Wonderland positions further highlight the erroneous, arbitrary and capricious nature of LINA's approach to Plaintiff's claim.

In summary, LINA's "legal intoxication" exclusion was and is not a valid basis for denying benefits to Plaintiff.  The record indicates that LINA knew as much.  When Plaintiff challenged the applicability of this exclusion on administrative appeal, LINA for the first time asserted a second, equally meritless ground for denying benefits.

## IV.     THE EFFECTS OF NORMAL AGING ARE NOT A PERMISSIBLE BASIS FOR DENYING ACCIDENTAL DEATH BENEFITS TO PLAINTIFF.

LINA's initial benefits denial was predicated solely on its "legal intoxication" exclusion.   However, after Plaintiff challenged the applicability of that exclusion on administrative appeal, LINA asserted a second ground for denying benefits.   Specifically, LINA found that since Gerald Thompson was "aged" (he was 69 years of age), no benefits were payable because an effect of normal aging, namely the increased susceptibility of the elderly to subdural hematomas, had contributed to his injury.

The source of this position was once again Dr. Bruff.   LINA's May 6, 2006 letter denying Plaintiff's administrative appeal summarized his opinion as follows:

> According to Dr. Bruff's opinion, Subdural hematomas  do develop in the aged more readily than they do in younger adults.   Mr. Thompson was nearly 70 years of age, and there are changes in the brain that result in easier formation of subdural hematoma.   Particularly, what occurs is there is some normal age-related atrophy of the cerebellar hemispheres.   When this occurs, the brain substance retracts from the skull.   However, there are bridging veins between the fibrous covering of the brain or meninges and the table of the skull bone.   Due to this traction on the bridging veins, slight trauma can result in tearing of the bridging veins, which ultimately results in the subdural hematoma. (AR 00029)

The appeal denial letter then went on to find that this constituted a bodily infirmity that precluded accidental death coverage.   LINA stated its position as follows:

> Additionally, this policy will only cover accidents which result directly and independently of all other causes and are not contributed to by disease, sickness, mental or bodily infirmity.   Having reviewed the available records, we have determined that Mr. Thompson's age-related changes in the brain contributed to the chain of events leading to his death.   Therefore, we have

13

determined that Accidental Death benefits are not payable at this time under
the provisions of Accidental Death policy OK 96-0038.  (AR 0029-30)

In researching this issue, Plaintiff's counsel found that several insurers had advanced

similar arguments as a defense to accidental death claims in the 1930's and early 1940's.

These defenses were rejected by the courts with observations like the policy would not

"mean anything" or that "almost every policy would be valueless" if such a defense were to

be accepted.  Accidental death defenses based on the effects of normal aging then appear to

have largely disappeared from the jurisprudence until resurrected by LINA as a basis for

denying Plaintiff's claim in 2006.

For example, in *Preferred Accident Ins. Co. of New York v. Combs*, 76 F.2d 775 (8th

Cir. 1935) ("*Combs*") the elderly insured had fallen and a short time later lapsed into

semiconsciousness and died three days later.  Death was found to have been caused by a

brain hemorrhage; the insured also suffered from a degree of arteriosclerosis normal for

persons of his age.  The insurer denied payment under its accidental death policy on the

ground that the insured's death had been caused in whole or in part by the diseased condition

of his arteries.  In flatly rejecting this argument, the *Combs* court observed:

> Just as differences between individuals constitute no ground for an insurance
> company's denying its responsibility under an accident policy, neither do the
> normal physical change that inevitably accompany one's own advance in years
> afford relief to the insurer.  Although the 'processes of life and of death are
> still, in their essential nature, unfathomed mysteries,' we do know that because
> man lives, he must grow old.  His hair greys; lines in his face appear; his
> senses become less acute; his ability to endure and to achieve decreases;  But
> because one cannot participate in sport with the vigor of two decades earlier,
> because he cannot ascend and descend stairs with the energy of former days,
> because he is more susceptible to winter ills and less resistant to the ailments

14

of the body, does not mean that one is 'diseased' within the meaning of an accident policy. Such policies are issued to people of different ages just as they are to people of different physical abilities. To have them mean anything, therefore, the protection they afford the insured must not be defeated by those expected and normal physical changes that inevitably come to all men.

76 F.2d at 781 (internal citations omitted).

Later in its opinion, the *Combs* court succinctly summarized the controlling legal principle as follows:

The insurance company assumes the risks of normal physical degeneration, as distinguished from 'disease.' Such clearly was the intention of the parties when the contract was entered into. 'A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules,' said Mr. Justice Cardozo when he was Chief Judge of the New York Court of Appeals. Nor is it accepted with the thought that the mere weakenings of age will render its benefits incapable of enjoyment.

*Id.* (internal citations omitted).

As noted in *Combs*, Benjamin Cardozo, then a justice of the New York Court of Appeals, rejected a similar argument in *Silverstein v. Metropolitan Life Ins. Co.*, 171 N.E. 914, 915 (N.Y. 1930). In that case, a person who was killed when struck by a milk can was denied accidental death benefits because he had a small ulcer that weakened his stomach wall and allowed the stomach's contents to escape when he was struck. In rejecting the insurer's position, Justice Cardozo noted that an accidental death policy "is not accepted with the thought that its coverage is to be restricted to an Apollo or Hercules." He went on to opine that a construction of the policy that allowed an insurer to deny benefits to a person suffering from a frail general condition that caused him or her to die from an accident that would not

have killed a healthy person "would reduce the policy and its coverage to contradiction and absurdity."

*Aetna Life Ins. Co. v. Young*, 113 F.2d 601, 602 (3d Cir. 1940) ("*Young*"), in affirming a judgment in favor of the insured for accidental death benefits, noted as follows:

> The insurer should not escape liability because one of the ailments which conventionally accompany advancing age happens to make an elderly insured more susceptible to the evil consequences of an accidental injury, and this is especially so when the insurer accepts premiums from an insured who is advanced in years.  If the insurer could thus avoid liability on the double indemnity or accident policy whenever senility and its resultant physical decadence appears, almost every policy would be valueless to the beneficiaries unless the force of the accident killed the insured instantly.

Most insurers got the message; cases advancing arguments like those rejected in *Combs* and *Young* mostly disappeared from the casebooks.  LINA, however, appears to be an exception.  In 2004, the Eleventh Circuit rejected a proposed LINA interpretation of its accidental death policy on the ground that it would render the policy "almost meaningless" and provide coverage only to insureds in perfect health, stating:

> The coverage provided under the LINA policy at issue would be rendered almost meaningless if we were to adopt the strict interpretation advanced by Appellee.  As the Fourth Circuit rightly pointed out, an overly strict interpretation of "directly and from no other causes" would provide insureds, or their beneficiaries, with coverage only where the insured was in perfect health at the time of the accident.

*Dixon*, *supra*, 389 F.3d at 1184.  This chastening by the Eleventh Circuit apparently had no effect, since just two years later LINA denied coverage to Gerald Thompson on the ground he was no longer in perfect health due to the effects of normal aging.

The potential implications of LINA's position are enormous. This basis for denying benefits had nothing to do with any characteristic of Gerald Thompson other than his age. Under LINA's policy interpretation, any senior citizen who dies from a subdural hematoma did not die accidentally, regardless of the cause of the hematoma. Moreover, there is no logical reason to limit this principle only to the "aged." Since "normal age-related atrophy of the cerebellar hemispheres" is an ongoing process, subdural hematomas also develop more readily in any person who happens to be older than whatever age the susceptibility to subdural hematoma is statistically at its absolute minimum. Thus, the logical extension of LINA's position is that nobody but the very young can die accidentally from a subdural hematoma.

There is also no reason to limit this principle to subdural hematomas. There are numerous examples of injuries to which particular groups of persons are more prone. For example, women are generally more susceptible than men to osteoporosis, and thus to injuries involving broken bones; other susceptibilities tend to be concentrated in particular ethnic and racial groups. Indeed, some studies have suggested that left-handed people are statistically more accident prone than right-handed persons. Under LINA's theory, it would be very difficult for a left-handed person to die accidentally, since virtually any mishap that occurred could be argued to have been contributed to by his or her "infirmity."

However, LINA's coverage position is important in the sense that LINA's reliance on a sham pretext for denying accidental death benefits to Plaintiff graphically demonstrates that LINA's "claims adjudication" process consists primarily of working backward from a

desired result.  LINA's claims unit in effect acted as a profit center with respect to Plaintiff's claim, since it is undisputed that LINA not only adjudicated the validity of Plaintiff's claim, but would have paid the claim out of its own pocket if benefits had been found to be due. By arbitrarily denying coverage for a risk it had accepted by issuing the policy, and denying Plaintiff accidental death benefits for no legitimate reason, LINA was in effect writing itself a check for $661,000, plus interest.  Such meritless, self-serving behavior should not be countenanced by the courts.[5]

---

[5]     Plaintiff must also negate LINA's affirmative defenses to be entitled to summary judgment.  Plaintiff has taken LINA's deposition pursuant to Rule 30(b)(6), Fed.R.Civ.P., and confirmed that LINA's affirmative defenses raise no new issues beyond those discussed in this memorandum.  See Deposition of Brian Billeter.

## V.    CONCLUSION

Plaintiff requests the entry of summary judgment in its favor, and also requests that

the Court award her a reasonable attorneys' fee to mitigate the effective loss of earned

insurance benefits[6] that will otherwise occur as a result of LINA's bad faith conduct, since

---

[6]        Five hundred thousand dollars of the $661,000 in coverage at issue consisted
of voluntary insurance for which Gerald Thompson had paid the premiums (AR0024).

Plaintiff had no choice but to retain and pay the undersigned attorneys to bring this action to

recover the benefits due her.

                                              Respectfully submitted,


James J. Dowling, Esquire                     s/ Charles P. Schropp
Florida Bar Number:  393754                   Charles P. Schropp
Law Offices of Berger & Dowling               Florida Bar Number:  206881
1150 Tampa Road                               Schropp, Buell & Elligett, P.A.
Palm Harbor, Florida  34683                   3003 West Azeele Street, Suite 100
Telephone:    (727) 785-5655                  Tampa, Florida  33609
Facsimile:    (727) 789-4317                  Telephone:   (813) 874-2600
                                              Facsimile:    (813) 874-1760

            Counsel for Plaintiff, Helen Thompson

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 9th day of July, 2007, a true and correct copy of

the foregoing Plaintiff's Motion for Summary Judgment was electronically filed with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing

to:

Steven D. Lehner, Esquire
Hinshaw & Culbertson LLP
100 South Ashley Drive, Suite 500
Tampa, Florida  33602                         s/ Charles P. Schropp
                                              Attorney

W:\1120.000\Plead\MSJ 001.wpd