UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HELEN THOMPSON,

      Plaintiff,

vs.                    CASE NO. 8:06-CV-01201-EAK-TBM

LIFE INSURANCE COMPANY     **DISPOSITIVE MOTION**
OF NORTH AMERICA,

      Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ACCOMPANYING STATEMENT OF UNDISPUTED MATERIAL FACTS AND SUPPORTING MEMORANDUM OF LAW

NOW COMES Defendant, LIFE INSURANCE COMPANY OF NORTH AMERICA ("LINA"), by and through its attorneys, Hinshaw & Culbertson LLP, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 3.01, M.D. Fla., moves for summary judgment in its favor and against Plaintiff Helen Thompson, and in support thereof, submits the following Statement of Undisputed Material Facts and Memorandum of Law.

## INTRODUCTION

The plaintiff, Helen Thompson, filed the instant action against LINA claiming accidental death benefits under an employee welfare benefits plan sponsored by Packing Corporation of America ("PCA"). The plaintiff's now deceased husband, Gerald Thompson, was an employee of PCA and a participant in the subject employee welfare benefits plan. The employee benefit plan at issue is governed by the Employment Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. §1001 *et. seq.).* Plaintiff filed a single claim for employee benefits under ERISA's civil enforcement provision, 29 U.S.C. §1132(a)(1)(B), challenging the administrative

denial of accidental death benefits under the PCA plan.  Such a claim is a judicial review of an administrative decision.[1]

The ERISA statute is silent as to the standard for review to be applied when reviewing an administrator's decision to deny benefits.  *Firestone Tire & Rubber Co., v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).  However, in an action arising under 29 U.S.C. § 1132(a)(1)(B), courts should apply the de novo standard of review " unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case, the " arbitrary and capricious" standard is the appropriate standard of review.  *Buonincontri v. Liberty Life Assur. Co. of Boston*, 424 F. Supp.2d 1302, 1398 (M.D. Fla. 2006) *quoting Firestone Tire & Rubber Co.*, 489 U.S. at 109. Under the arbitrary and capricious standard, the court will determine whether there was a " reasonable basis" for the administrator's decision " based upon the facts as known to the administrator at the time the decision was made." *Buonincontri*, 424 F. Supp.2d at 1398 *quoting Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1549 (11th Cir.1994).

Most ERISA benefit cases are therefore disposed of by way of motions for summary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure.  Here, LINA properly applied a coverage exclusion under the group accidental life insurance policy for deaths which are directly or indirectly, in whole or in part, the result of intoxication.  Intoxication substantially contributed to Mr. Thompson's death and therefore, no benefits were payable.  Accordingly, LINA requests this Court enter summary judgment in its favor.

---

[1] Citations to the Administrative Record used by LINA to evaluate Plaintiff's claim are noted as "R._".  The administrative records was filed as Exhibit A to the Affidavit of Brian Billeter filed on July 9, 2007.

6206382v1 867197

## UNDISPUTED STATEMENTS OF MATERIAL FACT

1.     The Plaintiff, Helen Thompson, filed the instant action against LINA claiming certain benefits under an employee welfare benefits plan sponsored by the Packaging Corporation of America ("PCA"). (R. 0027).

2.     Plaintiff was the spouse of Gerald Thompson, deceased, an employee of PCA and a participant in the employee welfare benefits plan sponsored by PCA.  (Amended Complaint, ¶6).

3.     The Packaging Corporation of America group accident policy proceeds were a group insurance benefit offered to each of its employees as a benefit of employment.  (Affidavit of B. Billeter, at ¶4).

4.     LINA served as the claims administrator of the Plan sponsored by Packaging Corporation of America. (Affidavit of B. Billeter at ¶5).

5.     On the night of August 23-24, 2005, Mr. Thompson was found laying on the ground in a parking lot poorly responsive. (R. 0015, 0181).

6.     After being discovered on the ground in the parking lot, Mr. Thompson was taken by ambulance to the hospital. (R. 0181).

7.     Upon arriving at the hospital, Mr. Thompson was conscious, but complained of a headache. (R. 0015, 0182).

8.     At that time he arrived at the hospital, Mr. Thompson had a blood alcohol content of 0.205. (R. 0182).

9.     A CT scan revealed a 6mm subdural hematoma and Mr. Thompson was admitted to the hospital for observation. (R. 0015, 0182).

10.     Shortly thereafter, Mr. Thompson became nonresponsive and a second CT scan showed that the hematoma had expanded to 2 cm. (R. 0015, 0182).

3

11.   Mr. Thompson's doctors concluded that he had suffered a right-side subdural hematoma, presumed to be the result of a mild trauma to the head. (R. 0015, 0181).

12.   Mr. Thompson's doctors performed an emergency evacuation, but Mr. Thompson subsequently died of his injuries on September 18, 2005. (R. 0015, 0179-181).

13.   As a result of Mr. Thompson's death, Plaintiff filed a claim for accidental death benefits under the subject policy. (Complaint at ¶7).

14.   The PCA policy provided, in part, that in addition to any benefit-specific exclusions, benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from the Covered Person's intoxication, as determined according to the laws of the jurisdiction in which the Covered Accident occurred. (R. 0028, 0098).

15.   LINA retained Dr. Thomas C. Bruff, Board Certified Occupational Medical, Internal Medicine, Medical Toxicology, to review the medical information presented to LINA regarding Mr. Thompson's injury and death. (R. 0028-29, 0034-38, 0061-64).

16.   After reviewing the medical information relating to Mr. Thompson's injury and death, it was Dr. Bruff's medical opinion that Mr. Thompson was significantly impaired from alcohol use at the time of his injury. (R. 0062).

17.   Mr. Thompson's blood alcohol content was well in excess of the legal limit of 0.08 in the state of Florida, where the accident occurred. (R. 0029).

18.   Dr. Bruff's opinion stated that such a blood alcohol content results in poor coordination, poor reaction time, difficulty with simple tasks, and a significant impairment of judgment. (R. 0029, 0062).

4

19.     Dr. Bruff specifically stated in his opinion that Mr. Thompson's significant impairment of alcohol set in motion chain of events that resulted in Mr. Thompson's death. (R. 0029, 0062).

20.     Based upon the medical evidence provided to LINA regarding Mr. Thompson's death, Dr. Bruff's medical opinion regarding the cause of death, as well as additional medical and factual information gathered and examined by LINA, LINA, on behalf of the PCA employee benefit plan, denied the claim for accidental death benefits based on the intoxication exclusion set forth in the subject group policy. (R. 0085-0092; 0027-0030).

## MEMORANDUM OF LAW

### A.     Summary judgment standard of review.

Summary judgment is an integral part of the federal rules as a whole, which are designed to secure a just and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such evidence exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he or she relies. *See Anderson*, 477 U.S. at 256-257. When the moving

6206382v1 867197

party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, courts should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and view the disputed evidence in the light most favorable to the nonmoving party. *See D.A. Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1265 (11th Cir. 2007). However, a factual dispute will not bar summary judgment unless the dispute could affect the outcome of the suit. *See Anderson*, 477 U.S. at 248.

**B.     The PCA Plan is an ERISA governed plan.**

The PCA Plan is governed by Employment Retirement Income Security Act of 1974 ("ERISA"). ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions) 29 U.S.C. § 1002(1).

In the seminal case of *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982), the court held that "a plan, fund or program under ERISA is established if, from the surrounding circumstances, a reasonable person and ascertain the intended benefits, a class of beneficiaries, the source of financing and procedures for receiving benefits." A distribution of an employee's handbook detailing ERISA rights is strong evidence that the employer has adopted an ERISA-regulated plan. *Gaylor v. John Hancock Mutual Life Insurance Co.*, 112 F.3d 460 (10th Cir. 1997); *Kenney v. Roland Parson Construction Corp.*, 28 F.3d 1254 (D.C. Cir. 1994).

6206382v1 867197

There is no requirement that an employer play any role in the administration of a plan for it to be deemed an employee welfare benefit plan under ERISA. *See Randol v. Midwest National Life Insurance Corp. of Tennessee, supra* (at 1550-51n 5 11th Cir.). ("[A] commercially purchased insurance policy under which the procedure for receiving benefits are all dictated by the insurance carrier can constitute a plan for ERISA purposes"), cert. den'd 510 U.S.863, 114 S. Ct. 180, 126 L. Ed. 2d 139 (1993). ("Under [the] statutory definition [of an employee welfare benefit plan], employers may easily establish ERISA plans by purchasing insurance for their employees."), cert. den'd 511 U.S.1019, 114 S. Ct. 1401, 128 L. Ed. 2d 74 (1994). Indeed, an ERISA plan can be established by an employer by doing nothing more than arranging for a group-type insurance program. *Duffin v. United Olympic Life Insurance Co.,* 195 U. S. App. Lexis 6021 (9th Cir. March 25, 1995).

In this case, the group policy at issue was secured by Mr. Thompson's employer, PCA, in connection with the employee benefit plan it sponsored. (R. 0027, 0085). The PCA policy proceeds were a group insurance benefit offered to each of its employees as a benefit of employment. Therefore, the PCA plan containing the accidental death benefits at issue in this litigation, was an ERISA plan.

## C.   LINA's denial of benefits pursuant to the subject policy's intoxication exclusion was appropriate.

### 1.   LINA's denial of benefits is subject to the arbitrary and capricious standard of review.

The Supreme Court has held that a denial of benefits challenged under §1132(a)(1)(B) of ERISA is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80

6206382v1 867197

(1989).  If the plan vests such discretion in the administrator, the decision is to be reviewed under the more deferential arbitrary capricious standard of review.  *Paramore v. Delta Airlines, Inc.*, 129 F.3d 1446, 1449 (11th Cir. 1997).   Where the plan confers discretion on the administrator to determine eligibility for benefits, a district court may only reverse the administrator's decision if it was arbitrary and capricious.   The "arbitrary and capricious" standard is essentially the same as the "abuse of discretion" standard.  *Hunt v. Hawthorne Associates, Inc.*, 119 F.3d 888, 911 (11th Cir. 1997).  LINA respectfully submits that its claim decision should be reviewed under the deferential arbitrary and capricious standard.

There is no magic language necessary to invoke the arbitrary and capricious standard of review. *see Mers v. Marriot International Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998) ("No magic words are required to confer discretion").  This Court should simply determine whether the plan documents vest the administrator with the discretion to evaluate an insured's eligibility for benefits.  *Serauskus v. Sun Life Assurance Company of Canada*, 2001 WL 1867884 (N.D. Ga. 2001).

The policy language in this case confers discretionary authority upon LINA to determine eligibility for benefits and to construe the terms of the plan, thereby requiring the Court to apply an "arbitrary and capricious" standard of review.  *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), *Morency v. Rudnick & Wolfe Staff Group Long Term Disability Insurance*, 2001 WL 737531 (M.D. Fla. 2001), *Sorrells v. Sun Life Assurance Company of Canada*, 85 F.2d 1221 (S.D.Ala. 2000).  The LINA group policy defines a Covered Accident as a sudden, unforeseeable, external event that results, directly or independently of all other causes, in a Covered Injury of Covered Loss and meets all of the following conditions:

1. occurs while the Covered Person is insured under this Policy;
2. is not contributed to by disease, Sickness, mental or bodily infirmity;

8

3. is not otherwise excluded under the terms of this policy.
(R. 0759).

A Covered Injury is defined as any bodily harm that results directly and independently of all other causes from a Covered Accident. (R. 0759). A Covered Loss is defined as a loss that is all of the following:

1. the result, directly and independently of all other causes, of a Covered Accident;
2. one of the Covered Losses specified in the Schedule of Covered Losses;
3. suffered by the Covered Person within the applicable time period specified in the Schedule of Benefits.
(R. 0759).

Further, the LINA policy requires that the applicant provide proof. The policy states that the claimant must provide the insurance company with **satisfactory proof** of loss before benefits will be paid. (R. 0767). Lastly, the plan specifically states that the LINA has right to examine, and make an autopsy in the case of death, of any person for whom a claim is made. (R. 0767).

Courts in the Eleventh Circuit that have been presented with similar language in a disability plan have found that language to be sufficient to grant the administrator discretion that requires the deferential arbitrary and capricious standard of review. See *Morency v. Rudnick & Wolfe Staff Group Long Term Disability Insurance*, 2001 WL 737531 (M.D. Fla. 2001), *Sorrells v. Sun Life Assurance Company of Canada*, 85 F.Supp.2d 1221 (S.D. Ala. 2000), See also *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 555 (6th Cir. 1998), *Snow v. Standard Insurance Co.*, 87 F.3d 327, 330 (9th Cir. 1996), *Patterson v. Caterpillar, Inc.*, 79 F.3d 503, 505 (7th Cir. 1995), *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 379 (7th Cir. 1994).

In *Morency*, Judge Bucklew of the Middle District of Florida analyzed language in a benefit plan that was similar to the language presented in the present case and held that the claims administrator had sufficient discretionary authority to invoke the arbitrary and capricious standard. In applying the arbitrary and capricious standard, Judge Bucklew explained:

The policy in this case defines "totally disabled" as "unable to work and ... unable to perform the substantial and material duties of his own occupation." The policy states that "[p]ayments will be made ... provided initial proof that the person is disabled is given to [Canada Life] at our Head Office. This proof must be satisfactory to [Canada Life]." Further, the policy provides that the claim will be paid when Canada Life "receive[s] satisfactory proof of [the] claim." Finally, Canada Life has the right "to have a physician examine anyone in respect of whom a claim is being made."

Many courts have construed similar language to vest the claims administrator with discretion to determine eligibility for benefits. *see e.g., Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 555-58 (6th Cir. 1998); *Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505 (7th Cir. 1995); *Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 378-880 (7th Cir. 1994); *see also Metropolitan Life Ins. v. Potter,* 992 F.Supp. 717, 724 (D.N.J. 1998); *Scarinci v. Ciccia,* 880 F.Supp. 359, 364 (E.D.Pa. 1995); *Sorrells v. Sun Life Assurance Co.,* 85 F.Supp.2d 1221, 1227-30 (S.D.Ala. 2000).

Based on the language in the policy, the Court finds that the policy provides Canada Life with discretionary authority in its claims decisions, and, therefore, Canada Life's decisions are subject to the arbitrary and capricious standard.

*Morency,* 2001 WL 737531 at 2 - 3.

The policy in the case at bar contains two express indicia of discretionary authority relating to claims decisions. Initially, the proof of disability must be satisfactory and acceptable to LINA, *i.e., satisfactory proof.* In addition, LINA has the right to collect additional information to assist it in making benefit determinations, *i.e., physical examinations.* This right to investigate and determine an acceptable level of proof mandates that the claims administrator, LINA, exercise its discretion in making benefit determinations. This was explained in *Sorrels v. Sun Life Assurance Company,* 85 F.Supp.2d 1221 (S.D. Ala. 2000). There the Court stated:

Based on the fact that the Policy authorizes defendant to gather additional information before paying benefits and that the proof of claim must be satisfactory to defendant (as opposed to All-Lock), the court concludes that defendant is a fiduciary under the Policy, that it has the authority to investigate and review claims submitted to it through the Plan Administrator, and that defendant must, therefore, exercise discretion in its investigation and review - thus rendering its denial decisions subject to the arbitrary and capricious standard.

*Sorrells,* 85 F.Supp.2d at 1230.

6206382v1 867197

More recently, in two separate opinions, Judge Conway in the Middle District of Florida and the Eleventh Circuit Court of Appeals held that language in an ERISA LTD plan requiring that proof be *satisfactory* or acceptable to the administrator is sufficient to convey discretion and to apply the arbitrary and capricious standard of review. *Curran v. Kemper National Services, Inc.*, 2005 WL 894840 at 3 (11th Cir. March 16, 2005), *Leggett v. Provident Life and Accident Ins. Co.*, 2004 WL 291223 (M.D. Fla. 2004) (emphasis added).   In the present case, the closely analogous language found in the subject policy is sufficient to invoke the arbitrary and capricious standard of review.

Further, the arbitrary and capricious standard of review applies even if a potential conflict of interest exists.  LINA is both the claims administrator of the insurance plan and the insurer of the policy, and, therefore, a potential conflict of interest might exist.  However, a conflict of interest does not change the standard of review.  It is simply a factor to be considered in applying the standard of review. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1563 (11th Cir. 1990), *cert. denied* 498 U.S. 1040 (1991).

It is well established that "[A] fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard of review for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in application of the standard will be significantly diminished." *Brown*, 898 F.2d at 1568. Further, "It is fundamental that the fiduciary's interpretation first must be wrong from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary. *Id.* at 1566, n. 12. Thus, the Court must review the claims administrator's decision to deny benefits to determine if that decision was "wrong." *Brown v. Blue Cross & Blue Shield*,

11

898 F.2d 1556 (11th Cir. 1990), *HCA Health Services of Georgia, Inc. v. Employers Health Insurance Company*, 240 F.3d 982 (11th Cir. 2001). If the Court agrees with the ultimate decision of the administrator, it is unnecessary to decide whether a conflict of interest exists. *Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 705 (11th Cir. 1995).

**2.   LINA's denial of benefits was not de novo "wrong" or arbitrary and capricious.**

In the instant case, LINA denied coverage and payment of benefits based upon an intoxication exclusion set forth in the policy. The policy exclusion provided that benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from the Covered Person's intoxication, as determined according to the laws of the jurisdiction in which the Covered Accident occurred. (R. 0028). In order for the intoxication exclusion to apply to Ms. Thompson's claim for benefits, (1) Mr. Thompson's blood alcohol content would need to be in excess of the legal limit in the state of Florida and (2) there must be a causal connection between the intoxication and the injury sustained by Mr. Thompson. *See Hastie v. J.C. Penny Life Ins. Co.*, 115 F.3d 895, 897 (11th Cir. 1997) (holding that when policy states that an intoxication exclusion will apply merely because the insured was intoxicated at the time of death, the policy will be interpreted to require a causal connection between the intoxication and the injury); *see also Harris v. Carolina Life Ins. Co.*, 233 So.2d 833, 834-35 (Fla. 1970).

Shortly after Mr. Thompson was discovered laying on the ground in a parking lot he had a blood alcohol content of 0.205. (R. 0015, 0182). In the state of Florida, blood alcohol content of 0.08 is prima facie evidence that a person is under the influence of alcohol for the purposes of the statute prohibiting the operation of a motor vehicle while under the influence of alcohol. Fla.

Stat. § 316.1934(2)(c).  Accordingly, Mr. Thompson was legally intoxicated at the time of his fall and thus, the first factor for application of the intoxication exclusion was satisfied.

Upon receiving the plaintiff's claim for benefits under Mr. Thompson's accidental death policy, LINA retained a medical expert, Dr. Thomas C. Bruff. to review the information regarding Mr. Thompson's injury and medical condition to determine whether there was a causal connection between Mr. Thompson's intoxication and injury.  After reviewing the medical information relating to Mr. Thompson's injury and death, it was Dr. Bruff's medical opinion Mr. Thompson was significantly impaired from alcohol use at the time of his injury, as his blood alcohol content of 0.205 was significantly in excess of the legal limit of 0.08.  (R. 0062).

Dr. Bruff's opinion stated that this blood alcohol content results in slurred speech, poor coordination, poor reaction time, difficulty with simple tasks, and a significant impairment of judgment.  (R. 0029, 0062).  Dr. Bruff reasoned that because of his impairment, Mr. Thompson tripped and fell in the parking lot, hitting his head, causing the subdural hematoma and a period of unconsciousness.  (R. 0029, 0062).  There is no other evidence in the administrative record providing an alternative explanation for Mr. Thompson's fall other than his intoxication.  Thus, having determined that there was a casual connection between Mr. Thompson's intoxication and the injury he sustained, which ultimately resulted in his death, LINA properly applied the intoxication exclusion and denied accidental death benefits under the intoxication exclusion set forth in the subject policy.  (R. 0085-0092; 0027-0030).

In the limited situations where the Eleventh Circuit courts have been confronted with similar circumstances surrounding a denial of accidental death benefits, the courts have upheld the denial of accidental death benefits pursuant to intoxication exclusions.  For example, in *McClurg v. Hartford Life and Accident Ins. Co.*, 2006 WL 2801878 (M.D. Fla. Sept. 28, 2006),

13

the former spouse of a filed a claim under an accidental death and dismemberment policy based upon the death of her husband, who accidentally shot himself while placing a loaded hunting rifle into his vehicle. The deceased individual's autopsy and forensic toxicology lab reports determined that his blood alcohol content was 0.13 and that he had been consuming alcoholic beverages shortly prior to his death. The *McClurg* court upheld the defendant's determination that the deceased's intoxication affected his judgment and ability to properly handle his rifle and therefore, was a contributing cause to his death. *Id.* at *2.

The Fourth Circuit has also upheld the denial of accidental death benefits pursuant to intoxication exclusions. In *Balthis v. AIG Life Ins. Co.*, 5 Fed. Appx. 320 (4th Cir. 2001), the beneficiary of a life insurance policy filed a claim seeking benefits relating to the death of his brother. The decedent's autopsy report stated that his cause of death was "acute ethanol intoxication with aspiration of gastric contents." *Id.* at 321. The decedent's blood alcohol concentration at the time of his death was 0.16%. *Id.* The decedent had been out drinking with friends, had dinner, and fell asleep on the couch. At some point, he vomited due to over-intoxication and choked to death on his vomit. *Id.* The Fourth Circuit held that the evidence clearly indicated that the decedent was so impaired at the time of his death due to alcohol that he died as a result and therefore, the decedent's brother's claim for benefits were properly denied pursuant to the intoxication exclusion of the subject policy. *Id.*

In this case, the evidence clearly demonstrates that Mr. Thompson was intoxicated well beyond the legal limit for intoxication in the State of Florida. At that time he arrived at the hospital, Mr. Thompson had a blood alcohol content of 0.205. (R. 0182). Mr. Thompson's blood alcohol content, therefore, was clearly in excess of the legal limit of 0.08 in the State of Florida. *See* Fla. Stat. § 316.1934(2)(c). Administrative reliance on tested blood alcohol levels

and toxicology results, in comparison with the applicable legal limit, has been upheld routinely by courts applying ERISA in circumstances similar to this case. *See e.g., Sorrells v. Sun Life Assur. Co. of Canada*, 85 F. Supp.2d 1221, 1233 (S.D. Ala. 2000) (upholding reliance on "toxicology report" and "blood alcohol content" as conclusive evidence of "intoxication."); *Graham v. Western Ky. Navigation, Inc.*, 229 F.3d 1151, 2000 WL 1234319, **1-3 (6th Cir. 2000) (holding that the "statutory standard governing driving under the influence provides a suitably objective measure for [administrator] to conclude that [insured] was legally intoxicated at the time of the accident," rejecting claimant's argument that the "blood alcohol test was somehow less than reliable," and affirming summary judgment for administrator); *Walker v. Met. Life Ins. Co.*, 24 F. Supp.2d 775, 777 (E.D. Mich. 1997) (upholding administrator's finding of intoxication where decedent's blood alcohol level exceeded "legal limit" in state where fatal auto accident occurred); *Jones v. Aetna Life Ins. Co.*, 2002 WL 1870469, *4 (E.D. Pa. 2002) (entering summary judgment for administrator where "toxicology report evidences that Plaintiff's blood alcohol content was .157% at the time of the accident, a level in excess of what Pennsylvania presumes ... renders the person incapable of safe driving").

Plaintiff will likely attempt to present evidence that, despite the fact Mr. Thompson's blood alcohol content was 0.205 at the time he arrived at the hospital, his blood alcohol content may have been significantly lower at the time of the fall. However, courts that have been confronted with similar arguments have dismissed those contentions as purely speculative and refused to deny summary judgment on that basis. *See Jones v. Aetna Life Ins. Co.*, 2002 WL 1870469 at *6 n.2 (E.D. Pa. Aug. 14, 2002). Plaintiff's contention is likewise speculative and should be disregarded by this Court.

6206382v1 867197

Based upon the medical evidence provided to LINA regarding Mr. Thompson's death, Dr. Bruff's medical opinion regarding the cause of death, as well as additional medical and factual information gathered and examined by LINA, LINA, on behalf of the PCA employee benefit plan, denied the claim for accidental death benefits based on the intoxication exclusion set forth in the subject group policy. (R. 0085-0092; 0027-0030). Therefore, based upon the foregoing, LINA's application of the intoxication exclusion was correctly applied and LINA's denial of benefits should be upheld by this Court

### 3. LINA's Decision Is Not Tainted by Self-Interest.

Assuming arguendo, that LINA was de novo "wrong", but entitled to the heightened arbitrary and capricious standard, the Court then must conduct an analysis of whether LINA's decision was tainted by self interest. Although it has been held that the arbitrary and capricious standard should be heightened, and applied in a less deferential manner, where the claims administrator has a conflict, such a conclusion is not automatic. *Vickers v. Guardian Life*, 204 F. Supp 2d at 1333. The presence of a conflict simply shifts the burden to the plan administrator to prove that its interpretation of the plan is not tainted by self interest. *Id*. In the present case there is nothing to suggest that the payment of a single claim by a large insurance company such as LINA is sufficient incentive to alter the claims decision process. This position was explained by the Seventh Circuit in *Mers v. Marriot International Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014 (7th Cir. 1998) wherein it stated:

> For similar reasons, we find no inherent conflict of interest in this case. A decision to award Mers benefits would cost AIG $200,000. AIG has consistently been named as one of the fifty largest companies in the Fortune 500 listing. The impact of granting or denying benefits in this case is minuscule compared to AIG's bottom line.

*Mers*, 144 F.3d 1020.

The Court further went on to explain that any assumption that a large insurance company, in a competitive market, is predisposed to deny claims is not warranted. Such a practice would only serve to drive away business and make it difficult to attract new customers. *Mers*, 144 F.3d at 1021 ("In the long run, this type of practice would harm an insurer by inducing current customers to leave and by damaging its chances of acquiring new customers."). Thus, any suggested taint arising from the fact that LINA is paying claims out of its own assets is cured by the size of the company and the business practicalities of a competitive market. Similarly reasoning was employed in *Thomas v. Lockheed Martin Information Systems*, 155 F.Supp.2d 1316 (N.D. Fla. 2001), wherein the Court specifically concluded that LINA's claims decision was not affected by the taint of self-interest:

> As a factor for consideration in the reasonableness of the fiduciary's determination I would have to conclude that the possible conflict of interest in this case **had no effect upon LINA's decision on the long-term disability benefits**. (emphasis supplied)

*Thomas*, 155 F.Supp.2d at 1326.

Moreover, a conflicted fiduciary may dispel any presumption of conflict by showing that a decision benefited the class of all plan participants. *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir. 1990). However, it appears that this analysis arose in, and is more applicable to, cases involving a fiduciary's legal construction of plan documents. *See, Thomas, supra.* In the context of a specific factual determination, which does not apply to the entire class of plan participants, it would be difficult to dispel the taint of conflict using the standard referenced above. Although, maximizing plan assets through reasoned and appropriate decisions does serve to benefit all class participants. *See, Helms v. Monsanto*, 728 F.2d 1416, 1420 (11th Cir. 1984) ("Congress wanted to assure those who participate in the plans actually

receive the benefits they are entitled to and do not lose these as a result of . . . lack of sufficient funds".)

> The difficulty of applying the Eleventh Circuit's burden shifting analysis in heightened arbitrary and capricious cases involving purely factual decisions, was explained by the Court in *Thomas v. Lockheed Martin Information Systems*. In that case, the Court noted that shifting the burden to the administrator in the presence of a conflict, "fails to accord the fiduciary any deference, which is the hallmark of the arbitrary and capricious standard of review." *Id.* at 1326. The Court concluded that such a heightened test, because it shifts the burden to the plan administrator, would actually be more stringent than a *de novo* review. Because of these conceptual difficulties the Court in *Thomas* reasoned that the sliding scale approach in heightened arbitrary and capricious cases involving purely factual findings was more appropriate.

*Thomas* at 1326.  Even considering LINA's decision under a shifted burden, LINA has demonstrated that its denial of Plaintiff's claim for LTD benefits was not tainted by self-interest, and was reasonable based upon the administrative record.

**D.     LINA was not required to provide Plaintiff with Plan documents.**

In addition to seeking a reversal of LINA's decision to deny benefits, Plaintiff also alleges that LINA wrongfully withheld ERISA Plan documents from Plaintiff.  Although it is not clearly pleaded in Plaintiff's complaint, it appears that Plaintiff is seeking penalties under § 1132(c) for its failure to make disclosures allegedly mandated by § 1024(b)(4).  The duty to furnish documents under § 1024(b)(4) applies only to the plan "administrator", as that term is defined in ERISA.  The text 29 U.S.C. § 1024(b)(4) makes this clear by providing that:

> The *administrator* shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. (Emphasis added.)

The provision allowing for the imposition of penalties, § 1132(c)(1)(B), also makes clear that only an "administrator" may be held liable for them:

*Any administrator ...* (B) who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal. *See* 28 U.S.C. § 1132(c)(1) (emphasis added).

This clear statutory language has led courts to hold that a defendant is subject to penalties under § 1132(c) only if it is the plan "administrator" as ERISA defines that term. *Griswell v. Reliance Standard Ins. Co.*, 209 Fed. Appx. 888, 890 (11th Cir. 2006); *Hamilton v. Allen-Bradley Co., Inc.*, 244 F.3d 819, 824 (11th Cir. 2001); *Giertz-Richardson v. Hartford Life and Acc. Ins. Co.*, 2007 WL 1099094 (M.D. Fla). Insurance companies that simply provide claims administration services are not proper party defendants to a claim under § 1132(c). *Griswell v. Reliance Standard Ins. Co.*, 209 Fed. Appx. at 890. ERISA defines "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated," or "if an administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A)(i), (ii).

In this case, the group policy at issue was secured by Mr. Thompson's employer, PCA, in connection with the employee benefit plan it sponsored. (R. 0027, 0085). The PCA policy proceeds were a group insurance benefit offered to each of its employees as a benefit of employment. PCA served as the administrator of the employee benefit plan it sponsored. LINA was merely the claims administrator of the group policy at issue. Accordingly, LINA was under no obligation to furnish Plaintiff with plan documentation. Rather, that obligation to fell to PCA as the plan administrator. Consequently, LINA cannot be held liable for failing to provide Plaintiff plan documentation and LINA is entitled to summary judgment in its favor.

6206382v1 867197

WHEREFORE, LIFE INSURANCE COMPANY OF NORTH AMERICA respectfully prays this Honorable Court enter an order granting summary judgment in its favor on Plaintiff's claims in this litigation and for such further relief as the Court deems just and proper.

s/Steven D. Lehner
Steven D. Lehner, Esquire
Florida Bar No. 039373
slehner@hinshawlaw.com
HINSHAW & CULBERTSON LLP
100 South Ashley Drive, Suite 500
Tampa, Florida 33602
Telephone: 813-276-1662
Facsimile: 813-276-1956

### CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  James J. Dowling, Esquire; Law Offices of Berger & Dowling; 1150 Tampa Road; Palm Harbor, Florida 34683; and Charles P. Schropp, Esquire; Schropp, Buell & Elligett, P.A.; 3003 West Azeele Street, Suite 100; Tampa, Florida 33609; Attorneys For Plaintiff.

/s/Steven D. Lehner

6206382v1 867197

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HELEN THOMPSON,

        Plaintiff,

vs.                              CASE NO. 8:06-CV-01201-EAK-TBM

LIFE INSURANCE COMPANY       **DISPOSITIVE MOTION**
OF NORTH AMERICA,

        Defendant.
_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ACCOMPANYING STATEMENT OF UNDISPUTED MATERIAL FACTS AND SUPPORTING MEMORANDUM OF LAW

    NOW COMES Defendant, LIFE INSURANCE COMPANY OF NORTH AMERICA ("LINA"), by and through its attorneys, Hinshaw & Culbertson LLP, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 3.01, M.D. Fla., moves for summary judgment in its favor and against Plaintiff Helen Thompson, and in support thereof, submits the following Statement of Undisputed Material Facts and Memorandum of Law.

## INTRODUCTION

    The plaintiff, Helen Thompson, filed the instant action against LINA claiming accidental death benefits under an employee welfare benefits plan sponsored by Packing Corporation of America ("PCA"). The plaintiff's now deceased husband, Gerald Thompson, was an employee of PCA and a participant in the subject employee welfare benefits plan. The employee benefit plan at issue is governed by the Employment Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. §1001 *et. seq.).* Plaintiff filed a single claim for employee benefits under ERISA's civil enforcement provision, 29 U.S.C. §1132(a)(1)(B), challenging the administrative

denial of accidental death benefits under the PCA plan. Such a claim is a judicial review of an administrative decision.[1]

The ERISA statute is silent as to the standard for review to be applied when reviewing an administrator's decision to deny benefits. *Firestone Tire & Rubber Co., v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, in an action arising under 29 U.S.C. § 1132(a)(1)(B), courts should apply the de novo standard of review " unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case, the " arbitrary and capricious" standard is the appropriate standard of review. *Buonincontri v. Liberty Life Assur. Co. of Boston*, 424 F. Supp.2d 1302, 1398 (M.D. Fla. 2006) *quoting Firestone Tire & Rubber Co.*, 489 U.S. at 109. Under the arbitrary and capricious standard, the court will determine whether there was a " reasonable basis" for the administrator's decision " based upon the facts as known to the administrator at the time the decision was made." *Buonincontri*, 424 F. Supp.2d at 1398 *quoting Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1549 (11th Cir.1994).

Most ERISA benefit cases are therefore disposed of by way of motions for summary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure. Here, LINA properly applied a coverage exclusion under the group accidental life insurance policy for deaths which are directly or indirectly, in whole or in part, the result of intoxication. Intoxication substantially contributed to Mr. Thompson's death and therefore, no benefits were payable. Accordingly, LINA requests this Court enter summary judgment in its favor.

---

[1] Citations to the Administrative Record used by LINA to evaluate Plaintiff's claim are noted as "R. ". The administrative records was filed as Exhibit A to the Affidavit of Brian Billeter filed on July 9, 2007.

## UNDISPUTED STATEMENTS OF MATERIAL FACT

1.     The Plaintiff, Helen Thompson, filed the instant action against LINA claiming certain benefits under an employee welfare benefits plan sponsored by the Packaging Corporation of America ("PCA"). (R. 0027).

2.     Plaintiff was the spouse of Gerald Thompson, deceased, an employee of PCA and a participant in the employee welfare benefits plan sponsored by PCA. (Amended Complaint, ¶6).

3.     The Packaging Corporation of America group accident policy proceeds were a group insurance benefit offered to each of its employees as a benefit of employment. (Affidavit of B. Billeter, at ¶4).

4.     LINA served as the claims administrator of the Plan sponsored by Packaging Corporation of America. (Affidavit of B. Billeter at ¶5).

5.     On the night of August 23-24, 2005, Mr. Thompson was found laying on the ground in a parking lot poorly responsive. (R. 0015, 0181).

6.     After being discovered on the ground in the parking lot, Mr. Thompson was taken by ambulance to the hospital. (R. 0181).

7.     Upon arriving at the hospital, Mr. Thompson was conscious, but complained of a headache. (R. 0015, 0182).

8.     At that time he arrived at the hospital, Mr. Thompson had a blood alcohol content of 0.205. (R. 0182).

9.     A CT scan revealed a 6mm subdural hematoma and Mr. Thompson was admitted to the hospital for observation. (R. 0015, 0182).

10.    Shortly thereafter, Mr. Thompson became nonresponsive and a second CT scan showed that the hematoma had expanded to 2 cm. (R. 0015, 0182).

3

11.    Mr. Thompson's doctors concluded that he had suffered a right-side subdural hematoma, presumed to be the result of a mild trauma to the head. (R. 0015, 0181).

12.    Mr. Thompson's doctors performed an emergency evacuation, but Mr. Thompson subsequently died of his injuries on September 18, 2005. (R. 0015, 0179-181).

13.    As a result of Mr. Thompson's death, Plaintiff filed a claim for accidental death benefits under the subject policy. (Complaint at ¶7).

14.    The PCA policy provided, in part, that in addition to any benefit-specific exclusions, benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from the Covered Person's intoxication, as determined according to the laws of the jurisdiction in which the Covered Accident occurred. (R. 0028, 0098).

15.    LINA retained Dr. Thomas C. Bruff, Board Certified Occupational Medical, Internal Medicine, Medical Toxicology, to review the medical information presented to LINA regarding Mr. Thompson's injury and death. (R. 0028-29, 0034-38, 0061-64).

16.    After reviewing the medical information relating to Mr. Thompson's injury and death, it was Dr. Bruff's medical opinion that Mr. Thompson was significantly impaired from alcohol use at the time of his injury. (R. 0062).

17.    Mr. Thompson's blood alcohol content was well in excess of the legal limit of 0.08 in the state of Florida, where the accident occurred. (R. 0029).

18.    Dr. Bruff's opinion stated that such a blood alcohol content results in poor coordination, poor reaction time, difficulty with simple tasks, and a significant impairment of judgment. (R. 0029, 0062).

4

19.     Dr. Bruff specifically stated in his opinion that Mr. Thompson's significant impairment of alcohol set in motion chain of events that resulted in Mr. Thompson's death. (R. 0029, 0062).

20.     Based upon the medical evidence provided to LINA regarding Mr. Thompson's death, Dr. Bruff's medical opinion regarding the cause of death, as well as additional medical and factual information gathered and examined by LINA, LINA, on behalf of the PCA employee benefit plan, denied the claim for accidental death benefits based on the intoxication exclusion set forth in the subject group policy. (R. 0085-0092; 0027-0030).

## MEMORANDUM OF LAW

**A.     Summary judgment standard of review.**

Summary judgment is an integral part of the federal rules as a whole, which are designed to secure a just and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).   Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).   The nonmoving party bears the burden of demonstrating that such evidence exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he or she relies. *See Anderson*, 477 U.S. at 256-257.  When the moving

party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, courts should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and view the disputed evidence in the light most favorable to the nonmoving party. *See D.A. Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1265 (11th Cir. 2007). However, a factual dispute will not bar summary judgment unless the dispute could affect the outcome of the suit. *See Anderson*, 477 U.S. at 248.

**B.      The PCA Plan is an ERISA governed plan.**

The PCA Plan is governed by Employment Retirement Income Security Act of 1974 ("ERISA"). ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions) 29 U.S.C. § 1002(1).

In the seminal case of *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982), the court held that "a plan, fund or program under ERISA is established if, from the surrounding circumstances, a reasonable person and ascertain the intended benefits, a class of beneficiaries, the source of financing and procedures for receiving benefits." A distribution of an employee's handbook detailing ERISA rights is strong evidence that the employer has adopted an ERISA-regulated plan. *Gaylor v. John Hancock Mutual Life Insurance Co.*, 112 F.3d 460 (10th Cir. 1997); *Kenney v. Roland Parson Construction Corp.*, 28 F.3d 1254 (D.C. Cir. 1994).

6206382v1 867197

There is no requirement that an employer play any role in the administration of a plan for it to be deemed an employee welfare benefit plan under ERISA. *See Randol v. Midwest National Life Insurance Corp. of Tennessee, supra* (at 1550-51n 5 11th Cir.). ("[A] commercially purchased insurance policy under which the procedure for receiving benefits are all dictated by the insurance carrier can constitute a plan for ERISA purposes"), cert. den'd 510 U.S.863, 114 S. Ct. 180, 126 L. Ed. 2d 139 (1993). ("Under [the] statutory definition [of an employee welfare benefit plan], employers may easily establish ERISA plans by purchasing insurance for their employees."), cert. den'd 511 U.S.1019, 114 S. Ct. 1401, 128 L. Ed. 2d 74 (1994). Indeed, an ERISA plan can be established by an employer by doing nothing more than arranging for a group-type insurance program. *Duffin v. United Olympic Life Insurance Co.,* 195 U. S. App. Lexis 6021 (9th Cir. March 25, 1995).

In this case, the group policy at issue was secured by Mr. Thompson's employer, PCA, in connection with the employee benefit plan it sponsored. (R. 0027, 0085). The PCA policy proceeds were a group insurance benefit offered to each of its employees as a benefit of employment. Therefore, the PCA plan containing the accidental death benefits at issue in this litigation, was an ERISA plan.

**C.     LINA's denial of benefits pursuant to the subject policy's intoxication exclusion was appropriate.**

> **1.     LINA's denial of benefits is subject to the arbitrary and capricious standard of review.**

The Supreme Court has held that a denial of benefits challenged under §1132(a)(1)(B) of ERISA is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80

(1989). If the plan vests such discretion in the administrator, the decision is to be reviewed under the more deferential arbitrary capricious standard of review. *Paramore v. Delta Airlines, Inc.*, 129 F.3d 1446, 1449 (11th Cir. 1997). Where the plan confers discretion on the administrator to determine eligibility for benefits, a district court may only reverse the administrator's decision if it was arbitrary and capricious. The "arbitrary and capricious" standard is essentially the same as the "abuse of discretion" standard. *Hunt v. Hawthorne Associates, Inc.*, 119 F.3d 888, 911 (11th Cir. 1997). LINA respectfully submits that its claim decision should be reviewed under the deferential arbitrary and capricious standard.

There is no magic language necessary to invoke the arbitrary and capricious standard of review. *see Mers v. Marriot International Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998) ("No magic words are required to confer discretion"). This Court should simply determine whether the plan documents vest the administrator with the discretion to evaluate an insured's eligibility for benefits. *Serauskus v. Sun Life Assurance Company of Canada*, 2001 WL 1867884 (N.D. Ga. 2001).

The policy language in this case confers discretionary authority upon LINA to determine eligibility for benefits and to construe the terms of the plan, thereby requiring the Court to apply an "arbitrary and capricious" standard of review. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), *Morency v. Rudnick & Wolfe Staff Group Long Term Disability Insurance*, 2001 WL 737531 (M.D. Fla. 2001), *Sorrells v. Sun Life Assurance Company of Canada*, 85 F.2d 1221 (S.D.Ala. 2000). The LINA group policy defines a Covered Accident as a sudden, unforeseeable, external event that results, directly or independently of all other causes, in a Covered Injury of Covered Loss and meets all of the following conditions:

    1. occurs while the Covered Person is insured under this Policy;
    2. is not contributed to by disease, Sickness, mental or bodily infirmity;

8

3. is not otherwise excluded under the terms of this policy.
(R. 0759).

A Covered Injury is defined as any bodily harm that results directly and independently of all

other causes from a Covered Accident. (R. 0759). A Covered Loss is defined as a loss that is all

of the following:

1. the result, directly and independently of all other causes, of a Covered Accident;
2. one of the Covered Losses specified in the Schedule of Covered Losses;
3. suffered by the Covered Person within the applicable time period specified in the Schedule of Benefits.
(R. 0759).

Further, the LINA policy requires that the applicant provide proof. The policy states that

the claimant must provide the insurance company with *satisfactory proof* of loss before benefits

will be paid. (R. 0767). Lastly, the plan specifically states that the LINA has right to examine,

and make an autopsy in the case of death, of any person for whom a claim is made. (R. 0767).

Courts in the Eleventh Circuit that have been presented with similar language in a

disability plan have found that language to be sufficient to grant the administrator discretion that

requires the deferential arbitrary and capricious standard of review. See *Morency v. Rudnick &*

*Wolfe Staff Group Long Term Disability Insurance*, 2001 WL 737531 (M.D. Fla. 2001), *Sorrells*

*v. Sun Life Assurance Company of Canada*, 85 F.Supp.2d 1221 (S.D. Ala. 2000), See also *Perez*

*v. Aetna Life Insurance Co.*, 150 F.3d 550, 555 (6th Cir. 1998), *Snow v. Standard Insurance Co.*,

87 F.3d 327, 330 (9th Cir. 1996), *Patterson v. Caterpillar, Inc.*, 79 F.3d 503, 505 (7th Cir. 1995),

*Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 379 (7th Cir. 1994).

In *Morency*, Judge Bucklew of the Middle District of Florida analyzed language in a

benefit plan that was similar to the language presented in the present case and held that the

claims administrator had sufficient discretionary authority to invoke the arbitrary and capricious

standard. In applying the arbitrary and capricious standard, Judge Bucklew explained:

9

>    The policy in this case defines "totally disabled" as "unable to work and
>    ... unable to perform the substantial and material duties of his own
>    occupation." The policy states that "[p]ayments will be made ... provided initial
>    proof that the person is disabled is given to [Canada Life] at our Head Office.
>    This proof must be satisfactory to [Canada Life]." Further, the policy provides
>    that the claim will be paid when Canada Life "receive[s] satisfactory proof of
>    [the] claim." Finally, Canada Life has the right "to have a physician examine
>    anyone in respect of whom a claim is being made."
>
>    Many courts have construed similar language to vest the claims administrator
>    with discretion to determine eligibility for benefits. *see e.g., Perez v. Aetna Life
>    Ins. Co.,* 150 F.3d 550, 555-58 (6th Cir. 1998); *Patterson v. Caterpillar, Inc.,* 70
>    F.3d 503, 505 (7th Cir. 1995); *Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375,
>    378-880 (7th Cir. 1994); *see also Metropolitan Life Ins. v. Potter,* 992 F.Supp.
>    717, 724 (D.N.J. 1998); *Scarinci v. Ciccia,* 880 F.Supp. 359, 364 (E.D.Pa. 1995);
>    *Sorrells v. Sun Life Assurance Co.,* 85 F.Supp.2d 1221, 1227-30 (S.D.Ala. 2000).
>
>    Based on the language in the policy, the Court finds that the policy provides
>    Canada Life with discretionary authority in its claims decisions, and, therefore,
>    Canada Life's decisions are subject to the arbitrary and capricious standard.

*Morency,* 2001 WL 737531 at 2 - 3.

The policy in the case at bar contains two express indicia of discretionary authority relating to claims decisions. Initially, the proof of disability must be satisfactory and acceptable to LINA, *i.e., satisfactory proof.* In addition, LINA has the right to collect additional information to assist it in making benefit determinations, *i.e., physical examinations.* This right to investigate and determine an acceptable level of proof mandates that the claims administrator, LINA, exercise its discretion in making benefit determinations. This was explained in *Sorrels v. Sun Life Assurance Company,* 85 F.Supp.2d 1221 (S.D. Ala. 2000). There the Court stated:

>    Based on the fact that the Policy authorizes defendant to gather additional
>    information before paying benefits and that the proof of claim must be
>    satisfactory to defendant (as opposed to All-Lock), the court concludes
>    that defendant is a fiduciary under the Policy, that it has the authority to
>    investigate and review claims submitted to it through the Plan Administrator,
>    and that defendant must, therefore, exercise discretion in its investigation and
>    review - thus rendering its denial decisions subject to the arbitrary and capricious
>    standard.

*Sorrells,* 85 F.Supp.2d at 1230.

10

More recently, in two separate opinions, Judge Conway in the Middle District of Florida and the Eleventh Circuit Court of Appeals held that language in an ERISA LTD plan requiring that proof be ***satisfactory*** or acceptable to the administrator is sufficient to convey discretion and to apply the arbitrary and capricious standard of review. *Curran v. Kemper National Services, Inc.*, 2005 WL 894840 at 3 (11th Cir. March 16, 2005), *Leggett v. Provident Life and Accident Ins. Co.*, 2004 WL 291223 (M.D. Fla. 2004) (emphasis added). In the present case, the closely analogous language found in the subject policy is sufficient to invoke the arbitrary and capricious standard of review.

Further, the arbitrary and capricious standard of review applies even if a potential conflict of interest exists. LINA is both the claims administrator of the insurance plan and the insurer of the policy, and, therefore, a potential conflict of interest might exist. However, a conflict of interest does not change the standard of review. It is simply a factor to be considered in applying the standard of review. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1563 (11th Cir. 1990), *cert. denied* 498 U.S. 1040 (1991).

It is well established that "[A] fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard of review for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in application of the standard will be significantly diminished." *Brown*, 898 F.2d at 1568. Further, "It is fundamental that the fiduciary's interpretation first must be wrong from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary. *Id.* at 1566, n. 12. Thus, the Court must review the claims administrator's decision to deny benefits to determine if that decision was "wrong." *Brown v. Blue Cross & Blue Shield*,

898 F.2d 1556 (11th Cir. 1990), *HCA Health Services of Georgia, Inc. v. Employers Health Insurance Company*, 240 F.3d 982 (11th Cir. 2001). If the Court agrees with the ultimate decision of the administrator, it is unnecessary to decide whether a conflict of interest exists. *Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 705 (11th Cir. 1995).

    **2.**    **LINA's denial of benefits was not de novo "wrong" or arbitrary and capricious.**

In the instant case, LINA denied coverage and payment of benefits based upon an intoxication exclusion set forth in the policy. The policy exclusion provided that benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from the Covered Person's intoxication, as determined according to the laws of the jurisdiction in which the Covered Accident occurred. (R. 0028). In order for the intoxication exclusion to apply to Ms. Thompson's claim for benefits, (1) Mr. Thompson's blood alcohol content would need to be in excess of the legal limit in the state of Florida and (2) there must be a causal connection between the intoxication and the injury sustained by Mr. Thompson. *See Hastie v. J.C. Penny Life Ins. Co.*, 115 F.3d 895, 897 (11th Cir. 1997) (holding that when policy states that an intoxication exclusion will apply merely because the insured was intoxicated at the time of death, the policy will be interpreted to require a causal connection between the intoxication and the injury); *see also Harris v. Carolina Life Ins. Co.*, 233 So.2d 833, 834-35 (Fla. 1970).

Shortly after Mr. Thompson was discovered laying on the ground in a parking lot he had a blood alcohol content of 0.205. (R. 0015, 0182). In the state of Florida, blood alcohol content of 0.08 is prima facie evidence that a person is under the influence of alcohol for the purposes of the statute prohibiting the operation of a motor vehicle while under the influence of alcohol. Fla.

Stat. § 316.1934(2)(c). Accordingly, Mr. Thompson was legally intoxicated at the time of his fall and thus, the first factor for application of the intoxication exclusion was satisfied.

Upon receiving the plaintiff's claim for benefits under Mr. Thompson's accidental death policy, LINA retained a medical expert, Dr. Thomas C. Bruff. to review the information regarding Mr. Thompson's injury and medical condition to determine whether there was a causal connection between Mr. Thompson's intoxication and injury. After reviewing the medical information relating to Mr. Thompson's injury and death, it was Dr. Bruff's medical opinion Mr. Thompson was significantly impaired from alcohol use at the time of his injury, as his blood alcohol content of 0.205 was significantly in excess of the legal limit of 0.08. (R. 0062).

Dr. Bruff's opinion stated that this blood alcohol content results in slurred speech, poor coordination, poor reaction time, difficulty with simple tasks, and a significant impairment of judgment. (R. 0029, 0062). Dr. Bruff reasoned that because of his impairment, Mr. Thompson tripped and fell in the parking lot, hitting his head, causing the subdural hematoma and a period of unconsciousness. (R. 0029, 0062). There is no other evidence in the administrative record providing an alternative explanation for Mr. Thompson's fall other than his intoxication. Thus, having determined that there was a casual connection between Mr. Thompson's intoxication and the injury he sustained, which ultimately resulted in his death, LINA properly applied the intoxication exclusion and denied accidental death benefits under the intoxication exclusion set forth in the subject policy. (R. 0085-0092; 0027-0030).

In the limited situations where the Eleventh Circuit courts have been confronted with similar circumstances surrounding a denial of accidental death benefits, the courts have upheld the denial of accidental death benefits pursuant to intoxication exclusions. For example, in *McClurg v. Hartford Life and Accident Ins. Co.*, 2006 WL 2801878 (M.D. Fla. Sept. 28, 2006),

13

the former spouse of a filed a claim under an accidental death and dismemberment policy based upon the death of her husband, who accidentally shot himself while placing a loaded hunting rifle into his vehicle.  The deceased individual's autopsy and forensic toxicology lab reports determined that his blood alcohol content was 0.13 and that he had been consuming alcoholic beverages shortly prior to his death.  The *McClurg* court upheld the defendant's determination that the deceased's intoxication affected his judgment and ability to properly handle his rifle and therefore, was a contributing cause to his death.  *Id.* at *2.

The Fourth Circuit has also upheld the denial of accidental death benefits pursuant to intoxication exclusions.  In *Balthis v. AIG Life Ins. Co.*, 5 Fed. Appx. 320 (4th Cir. 2001), the beneficiary of a life insurance policy filed a claim seeking benefits relating to the death of his brother.  The decedent's autopsy report stated that his cause of death was "acute ethanol intoxication with aspiration of gastric contents." *Id.* at 321.  The decedent's blood alcohol concentration at the time of his death was 0.16%. *Id.*  The decedent had been out drinking with friends, had dinner, and fell asleep on the couch.  At some point, he vomited due to over-intoxication and choked to death on his vomit. *Id.*  The Fourth Circuit held that the evidence clearly indicated that the decedent was so impaired at the time of his death due to alcohol that he died as a result and therefore, the decedent's brother's claim for benefits were properly denied pursuant to the intoxication exclusion of the subject policy. *Id.*

In this case, the evidence clearly demonstrates that Mr. Thompson was intoxicated well beyond the legal limit for intoxication in the State of Florida.  At that time he arrived at the hospital, Mr. Thompson had a blood alcohol content of 0.205. (R. 0182).  Mr. Thompson's blood alcohol content, therefore, was clearly in excess of the legal limit of 0.08 in the State of Florida. *See* Fla. Stat. § 316.1934(2)(c).  Administrative reliance on tested blood alcohol levels

14

and toxicology results, in comparison with the applicable legal limit, has been upheld routinely by courts applying ERISA in circumstances similar to this case. *See e.g., Sorrells v. Sun Life Assur. Co. of Canada*, 85 F. Supp.2d 1221, 1233 (S.D. Ala. 2000) (upholding reliance on "toxicology report" and "blood alcohol content" as conclusive evidence of "intoxication."); *Graham v. Western Ky. Navigation, Inc.*, 229 F.3d 1151, 2000 WL 1234319, **1-3 (6th Cir. 2000) (holding that the "statutory standard governing driving under the influence provides a suitably objective measure for [administrator] to conclude that [insured] was legally intoxicated at the time of the accident," rejecting claimant's argument that the "blood alcohol test was somehow less than reliable," and affirming summary judgment for administrator); *Walker v. Met. Life Ins. Co.*, 24 F. Supp.2d 775, 777 (E.D. Mich. 1997) (upholding administrator's finding of intoxication where decedent's blood alcohol level exceeded "legal limit" in state where fatal auto accident occurred); *Jones v. Aetna Life Ins. Co.*, 2002 WL 1870469, *4 (E.D. Pa. 2002) (entering summary judgment for administrator where "toxicology report evidences that Plaintiff's blood alcohol content was .157% at the time of the accident, a level in excess of what Pennsylvania presumes ... renders the person incapable of safe driving").

Plaintiff will likely attempt to present evidence that, despite the fact Mr. Thompson's blood alcohol content was 0.205 at the time he arrived at the hospital, his blood alcohol content may have been significantly lower at the time of the fall. However, courts that have been confronted with similar arguments have dismissed those contentions as purely speculative and refused to deny summary judgment on that basis. *See Jones v. Aetna Life Ins. Co.*, 2002 WL 1870469 at *6 n.2 (E.D. Pa. Aug. 14, 2002). Plaintiff's contention is likewise speculative and should be disregarded by this Court.

15

Based upon the medical evidence provided to LINA regarding Mr. Thompson's death, Dr. Bruff's medical opinion regarding the cause of death, as well as additional medical and factual information gathered and examined by LINA, LINA, on behalf of the PCA employee benefit plan, denied the claim for accidental death benefits based on the intoxication exclusion set forth in the subject group policy. (R. 0085-0092; 0027-0030). Therefore, based upon the foregoing, LINA's application of the intoxication exclusion was correctly applied and LINA's denial of benefits should be upheld by this Court

### 3. LINA's Decision Is Not Tainted by Self-Interest.

Assuming arguendo, that LINA was de novo "wrong", but entitled to the heightened arbitrary and capricious standard, the Court then must conduct an analysis of whether LINA's decision was tainted by self interest. Although it has been held that the arbitrary and capricious standard should be heightened, and applied in a less deferential manner, where the claims administrator has a conflict, such a conclusion is not automatic. *Vickers v. Guardian Life*, 204 F. Supp 2d at 1333. The presence of a conflict simply shifts the burden to the plan administrator to prove that its interpretation of the plan is not tainted by self interest. *Id.* In the present case there is nothing to suggest that the payment of a single claim by a large insurance company such as LINA is sufficient incentive to alter the claims decision process. This position was explained by the Seventh Circuit in *Mers v. Marriot International Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014 (7th Cir. 1998) wherein it stated:

> For similar reasons, we find no inherent conflict of interest in this case. A decision to award Mers benefits would cost AIG $200,000. AIG has consistently been named as one of the fifty largest companies in the Fortune 500 listing. The impact of granting or denying benefits in this case is minuscule compared to AIG's bottom line.

*Mers*, 144 F.3d 1020.

16

The Court further went on to explain that any assumption that a large insurance company, in a competitive market, is predisposed to deny claims is not warranted. Such a practice would only serve to drive away business and make it difficult to attract new customers. *Mers*, 144 F.3d at 1021 ("In the long run, this type of practice would harm an insurer by inducing current customers to leave and by damaging its chances of acquiring new customers."). Thus, any suggested taint arising from the fact that LINA is paying claims out of its own assets is cured by the size of the company and the business practicalities of a competitive market. Similarly reasoning was employed in *Thomas v. Lockheed Martin Information Systems*, 155 F.Supp.2d 1316 (N.D. Fla. 2001), wherein the Court specifically concluded that LINA's claims decision was not affected by the taint of self-interest:

> As a factor for consideration in the reasonableness of the fiduciary's determination I would have to conclude that the possible conflict of interest in this case **had no effect upon LINA's decision on the long-term disability benefits**. (emphasis supplied)

*Thomas*, 155 F.Supp.2d at 1326.

Moreover, a conflicted fiduciary may dispel any presumption of conflict by showing that a decision benefited the class of all plan participants. *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir. 1990). However, it appears that this analysis arose in, and is more applicable to, cases involving a fiduciary's legal construction of plan documents. *See, Thomas, supra.* In the context of a specific factual determination, which does not apply to the entire class of plan participants, it would be difficult to dispel the taint of conflict using the standard referenced above. Although, maximizing plan assets through reasoned and appropriate decisions does serve to benefit all class participants. *See, Helms v. Monsanto*, 728 F.2d 1416, 1420 (11th Cir. 1984) ("Congress wanted to assure those who participate in the plans actually

receive the benefits they are entitled to and do not lose these as a result of . . . lack of sufficient funds".)

> The difficulty of applying the Eleventh Circuit's burden shifting analysis in heightened arbitrary and capricious cases involving purely factual decisions, was explained by the Court in *Thomas v. Lockheed Martin Information Systems*. In that case, the Court noted that shifting the burden to the administrator in the presence of a conflict, "fails to accord the fiduciary any deference, which is the hallmark of the arbitrary and capricious standard of review." *Id.* at 1326. The Court concluded that such a heightened test, because it shifts the burden to the plan administrator, would actually be more stringent than a *de novo* review. Because of these conceptual difficulties the Court in *Thomas* reasoned that the sliding scale approach in heightened arbitrary and capricious cases involving purely factual findings was more appropriate.

*Thomas* at 1326. Even considering LINA's decision under a shifted burden, LINA has demonstrated that its denial of Plaintiff's claim for LTD benefits was not tainted by self-interest, and was reasonable based upon the administrative record.

**D.      LINA was not required to provide Plaintiff with Plan documents.**

In addition to seeking a reversal of LINA's decision to deny benefits, Plaintiff also alleges that LINA wrongfully withheld ERISA Plan documents from Plaintiff. Although it is not clearly pleaded in Plaintiff's complaint, it appears that Plaintiff is seeking penalties under § 1132(c) for its failure to make disclosures allegedly mandated by § 1024(b)(4). The duty to furnish documents under § 1024(b)(4) applies only to the plan "administrator", as that term is defined in ERISA. The text 29 U.S.C. § 1024(b)(4) makes this clear by providing that:

> The *administrator* shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. (Emphasis added.)

The provision allowing for the imposition of penalties, § 1132(c)(1)(B), also makes clear that only an "administrator" may be held liable for them:

*Any administrator* ... (B) who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal. *See* 28 U.S.C. § 1132(c)(1) (emphasis added).

This clear statutory language has led courts to hold that a defendant is subject to penalties under § 1132(c) only if it is the plan "administrator" as ERISA defines that term. *Griswell v. Reliance Standard Ins. Co.*, 209 Fed. Appx. 888, 890 (11th Cir. 2006); *Hamilton v. Allen-Bradley Co., Inc.*, 244 F.3d 819, 824 (11th Cir. 2001); *Giertz-Richardson v. Hartford Life and Acc. Ins. Co.*, 2007 WL 1099094 (M.D. Fla). Insurance companies that simply provide claims administration services are not proper party defendants to a claim under § 1132(c). *Griswell v. Reliance Standard Ins. Co.*, 209 Fed. Appx. at 890. ERISA defines "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated," or "if an administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A)(i), (ii).

In this case, the group policy at issue was secured by Mr. Thompson's employer, PCA, in connection with the employee benefit plan it sponsored. (R. 0027, 0085). The PCA policy proceeds were a group insurance benefit offered to each of its employees as a benefit of employment. PCA served as the administrator of the employee benefit plan it sponsored. LINA was merely the claims administrator of the group policy at issue. Accordingly, LINA was under no obligation to furnish Plaintiff with plan documentation. Rather, that obligation to fell to PCA as the plan administrator. Consequently, LINA cannot be held liable for failing to provide Plaintiff plan documentation and LINA is entitled to summary judgment in its favor.

19

WHEREFORE, LIFE INSURANCE COMPANY OF NORTH AMERICA respectfully prays this Honorable Court enter an order granting summary judgment in its favor on Plaintiff's claims in this litigation and for such further relief as the Court deems just and proper.

s/Steven D. Lehner
Steven D. Lehner, Esquire
Florida Bar No. 039373
slehner@hinshawlaw.com
HINSHAW & CULBERTSON LLP
100 South Ashley Drive, Suite 500
Tampa, Florida 33602
Telephone: 813-276-1662
Facsimile: 813-276-1956

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  James J. Dowling, Esquire; Law Offices of Berger & Dowling; 1150 Tampa Road; Palm Harbor, Florida 34683; and Charles P. Schropp, Esquire; Schropp, Buell & Elligett, P.A.; 3003 West Azeele Street, Suite 100; Tampa, Florida 33609; Attorneys For Plaintiff.

/s/Steven D. Lehner

20